## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

SERVICE EMPLOYEES )
INTERNATIONAL UNION )
HEALTHCARE PENNSYLVANIA, )    2:19-cv-00393-NR
)
)
Plaintiff, )
)
v. )
)
HERITAGE VALLEY HEALTH )
SYSTEM, )
)
Defendant. )

## OPINION

**J. Nicholas Ranjan, United States District Judge**

Under the parties' collective bargaining agreement, Heritage Valley Health System agreed to arbitrate "any dispute or complaint" that might arise. Yet when the union demanded to arbitrate a dispute about whether Heritage Valley was improperly forcing unionized nurses to work as "patient care assistants," Heritage Valley refused. So the union filed this lawsuit. Now on summary judgment, both parties agree that all material facts are undisputed and ask the Court to decide whether Heritage Valley's basis for refusing to arbitrate was sound. After careful consideration, the Court finds it was not.

The parties' arbitration agreement is broad. And where a broad arbitration agreement exists, the federal policy favoring arbitration creates a presumption of arbitrability unless the contract is "not susceptible of an interpretation that covers the asserted dispute." *Cup v. Ampco Pittsburgh Corp.*, 903 F.3d 58, 64 (3d Cir. 2018). Here, the potential "exclusion" identified by Heritage Valley does not apply to the union's grievance. Even if it did, that exclusion would at most prevent the union from compelling arbitration of just

one of its several claims, while all others would remain arbitrable. As a result, the Court will grant the union's motion for summary judgment and compel Heritage Valley to arbitrate the grievance.

## BACKGROUND

Service Employees International Union ("SEIU") is a labor union representing registered nurses employed by Heritage Valley at its hospital in Beaver, Pennsylvania. [ECF 21 at ¶ 2; ECF 27 at ¶ 2]. SEIU and Heritage Valley were parties to a collective bargaining agreement effective from July 1, 2016 until June 30, 2019. [ECF 21 at ¶ 1; ECF 27 at ¶ 1].

## I. The CBA requires Heritage Valley to maintain certain nurse-to-patient staffing ratios.

Under the CBA, Heritage Valley must maintain certain nurse-to-patient staffing ratios for various shifts, groups, and hospital departments. [ECF 21 at ¶ 3; ECF 27 at ¶ 3; ECF 1-2 at pp. 59-64, 67-68]. For example, Heritage Valley may not assign a unionized nurse to care for more than five patients during the "Core Group 1" cardio & pulmonary day shift. [ECF 21 at ¶ 3; ECF 27 at ¶ 3; ECF 1-2 at pp. 60].

The CBA also includes provisions governing the calculation of nurse-to-patient ratios, as well as the alteration of those ratios in some cases. [ECF 21 at ¶ 4; ECF 27 at ¶ 4; ECF 1-2 at pp. 63-64]. For example, in determining the nurse-to-patient ratio for a given shift, a "high risk baby" counts as two babies. And for unionized nurses working in critical care, a ratio of one nurse for every two patients "shall be adhered to." [*Id.*]

## II. Heritage Valley employs non-unionized "patient care assistants" to aid its unionized nurses.

Alongside its unionized nurses, Heritage Valley also employs non-unionized "patient care assistants." [ECF 21 at ¶ 5; ECF 27 at ¶ 5]. Patient

care assistants do not need a nursing license. Their job functions are also considerably less skilled than those performed by unionized nurses.

Because the CBA applies only to unionized nurses, it does not mandate staffing levels or ratios for patient care assistants. [ECF 21 at ¶ 3; ECF 27 at ¶ 3; ECF 1-2 at Art. 1.2]. Heritage Valley typically assigns each patient care assistant to aid between three and four nurses on a given unit. [ECF 21 at ¶ 5; ECF 27 at ¶ 5]. This means that care assistants can be responsible for providing care to over 20 patients, and almost always care for many more patients than each unionized nurse on a given shift.

## III. Article 7 of the CBA establishes a mandatory process for resolving all "grievances" arising under it.

Article 7.1 of the CBA establishes a mandatory process for resolving all "grievances" that might arise. [ECF 1-2 at Art. 7.1 ("…and [grievances] shall be processed and disposed of in the following manner.")]. The same provision broadly defines a "grievance" as "any dispute or complaint arising between the parties hereto, under or out of this Agreement or the interpretation, application, or any alleged breach thereof."

Article 7.2 states that a "grievance which has not been resolved" by informal means "may … be referred to arbitration by [SEIU] by notifying [Heritage Valley] in writing of its wish to appeal the grievance to arbitration." [*Id.* at Art. 7.2]. If SEIU makes such a demand, the Article provides that the parties "shall immediately" select an arbitrator in the manner specified.

Once chosen, the parties' arbitrator "shall have jurisdiction" over all "disputes arising out of grievances as defined in Section 7.1 of this Article." [*Id.* at Art. 7.5]. In other words, the arbitrator may resolve "any dispute or complaint arising … under or out of this Agreement or the interpretation, application, or any alleged breach thereof." [*Id.* at Art. 7.1]. The arbitrator's

eventual decision is "final, conclusive, and binding upon [Heritage Valley], [SEIU], and the employees." [*Id.* at Art. 7.4].

## IV. Heritage Valley compels unionized nurses to work as patient care assistants; SEIU responds with a class-action grievance.

SEIU filed the grievance at issue on October 28, 2018. [ECF 1-4]. In it, SEIU alleged that, on at least three dates during that month, Heritage Valley reassigned unionized nurses to work as patient care assistants outside their normal hospital units. According to SEIU, Heritage Valley then forced the nurses to perform low-level, unskilled tasks normally performed by care assistants, and to care for numbers of patients that exceeded mandatory staffing ratios.

SEIU contends that these actions breached Article 5, Article 10.5, Article 21, and Appendix A of the CBA, and that Article 7 requires Heritage Valley to arbitrate SEIU's grievance. [ECF 25 at p. 4]. Heritage Valley refuses to arbitrate and contends that its actions were "both permitted under Article 5.1 of the [CBA] and excluded from the [Article 7] grievance and arbitration procedure [by] Article 10.5(a)." [ECF 27 at ¶ 6]. On the latter point, Heritage Valley argues that Article 10.5(a) requires SEIU to submit its entire grievance to the "Professional Practice Committee" for a "recommended solution," rather than to arbitration. [ECF 17 at p. 6].

Article 10.5, the provision Heritage Valley relies on, states in full:

> 10.5 <u>Voluntary Floating/Pulling/Use of Agency Nurses.</u> The parties agree that it is in the interest of patient care that all staff assigned to a particular unit or work area shall be properly trained, oriented, and familiar with the policies and procedures of that unit or work area. To this end, the following guidelines shall apply:
>
> (a) Heritage Valley, Beaver shall not provide regular ongoing staffing in any area through the use of Agency personnel,

> temporary or contract nurses or floating/pulling of
> employees. In the event that such potential problem areas
> are identified, they shall be referred to the Professional
> Practice Committee for a recommended solution, and any
> dispute shall not be subject to the grievance and arbitration
> procedure in Article 7.

[ECF 1-2 at Art. 10.5].

The "Professional Practice Committee" is an internal, collaborative, and non-binding dispute resolution entity created by the CBA. According to Article 10.1 of the CBA, the Committee is comprised of "no more than five (5) representatives from the hospital, and five (5) representatives from the union." [*Id.* at Art. 10.1]. The Committee must meet "at least bi-monthly at a mutually agreeable time and place" to develop recommendations "regarding staffing" to be "forwarded to Heritage Valley." All recommendations must be "made by consensus," and Heritage Valley retains ultimate authority to "make final decisions and set staffing levels," no matter what the Committee proposes. Even so, Heritage Valley must give "full consideration" to any recommendation made by the Committee.

## V.    SEIU sues to compel arbitration.

As required by Article 7.1, Heritage Valley responded to SEIU's grievance in writing, by email, on December 11, 2018. [ECF 1-5]. In its email, Heritage Valley confirmed that it would refuse to arbitrate the grievance based on Article 10.5(a), which it interpreted to mean that "a dispute which involves the floating/pulling of employees is not subject to the grievance and arbitration procedure in Article 7." (internals omitted). Heritage Valley also invited SEIU to instead consider whether it wished "to refer the pulling issue to the Professional Practice Committee for a recommended solution, as set forth in Article 10.5." (internals omitted). SEIU declined. Four months later, SEIU filed this lawsuit, seeking to compel Heritage Valley to arbitrate the pending

grievance. [ECF 1]. The parties have agreed to resolve the case through the pending motions for summary judgment. [ECF 14; ECF 16; ECF 19].

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At summary judgment, the Court must ask whether the evidence presents "a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). In making that determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." *A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791, 794 (3d Cir. 2007).

The summary-judgment stage "is essentially 'put up or shut up' time for the non-moving party," which "must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Grp. Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d. Cir. 2006). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is warranted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

"The rule is no different where there are cross-motions for summary judgment." *Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008). The parties' filing of cross-motions "does not constitute an agreement that if one is rejected the other is necessarily justified[.]" *Id.* But the Court may "resolve cross-motions for summary judgment concurrently." *Hawkins v. Switchback MX, LLC*, 339 F. Supp. 3d 543, 547 (W.D. Pa. 2018). When doing

so, the Court views the evidence "in the light most favorable to the non-moving party with respect to each motion." *Id.*

## DISCUSSION & ANALYSIS

The parties agree that this case presents a pure question of contract interpretation, that no material facts are in dispute, and that the Court should resolve the case on summary judgment. Of course, they have opposite views on what that resolution should be. SEIU points out that the CBA broadly requires arbitration of "any dispute or complaint" arising under it and argues that its grievance here is no exception. Heritage Valley counters that Article 10.5(a) of the CBA exempts the matters raised in SEIU's grievance from arbitration. After careful consideration, the Court agrees with SEIU.

In deciding whether Heritage Valley should be compelled to arbitrate SEIU's grievance, "judicial review is limited to two threshold questions." *CardioNet, Inc. v. Cigna Health Corp.,* 751 F.3d 165, 171 (3d Cir. 2014). First, did the parties enter into a valid arbitration agreement? *Id.* (citation omitted). And second, does the parties' dispute fall within the language of the arbitration agreement? *Id.* The Court will address both questions in turn.

## I. The parties entered into a valid arbitration agreement.

As to the first question, there is no dispute that the parties' CBA contains a valid arbitration agreement. Article 7.2 provides that SEIU may unilaterally compel binding arbitration of any "grievance" that the parties cannot resolve informally. And a "grievance" is broadly defined by Article 7.1 as "any dispute or complaint arising between the parties hereto, under or out of this Agreement or the interpretation, application, or any alleged breach thereof[.]" [ECF 1-2 at Art. 7.1].

Neither party has argued that this provision is unenforceable or facially invalid. Thus, the Court finds that the parties have a valid, binding agreement to arbitrate "any dispute or complaint" related to the CBA.

## II. SEIU's grievance falls within the scope of the parties' arbitration agreement, and no express exclusion applies.

The remaining question, then, is whether SEIU's grievance falls within the parties' arbitration agreement. "The venerable legal principles guiding the construction and enforcement of arbitration clauses in collective bargaining agreements are well established." *Rite Aid of Pa., Inc. v. United Food & Commercial Workers Union, Local 1776*, 595 F.3d 128, 131 (3d Cir. 2010). The starting point is the "strong federal policy in favor of resolving labor disputes through arbitration." *Id.* Given this policy, "the inclusion of a broad arbitration clause in a collective bargaining agreement gives rise to a presumption of arbitrability which may be rebutted only by the most forceful evidence of a purpose to exclude the claim from arbitration." *Id.* (citation and internals omitted).

More specifically, "[w]here the presumption applies, a court may not deny a motion to compel arbitration unless it may be said with positive assurance that the contract's arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Cup v. Ampco Pittsburgh Corp.*, 903 F.3d 58, 64 (3d Cir. 2018) (citations and internals omitted). To make such a showing, the party opposing arbitration must typically identify an "express exclusion" barring arbitration, or else point to "strong and forceful" evidence of the parties' "intention to exclude the matter from arbitration." *United Steelworkers of Am., AFL-CIO-CLC v. Lukens Steel Co., Div. of Lukens*, 969 F.2d 1468, 1475 (3d Cir. 1992).

Of course, while this presumption exists in general, that does not mean the Court can compel arbitration of disputes the parties have not agreed to arbitrate. "[A]rbitration is still a creature of contract and a court cannot call for arbitration of matters outside of the scope of the arbitration clause." *Rite Aid,* 595 F.3d at 131 (citations and internals omitted). Indeed, "the Supreme Court has repeatedly warned against overreading its precedent concerning the presumption of arbitrability." *CardioNet*, 751 F.3d at 172 (citations and internals omitted); *see, e.g.*, *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010) ("[W]e have never held that this policy overrides the principle that a court may submit to arbitration only those disputes ... that the parties have agreed to submit.") (citations and internals omitted).

This means that when interpreting an arbitration clause, as always, "the plain language of the contract controls." *CardioNet*, 751 F.3d at 173. And while the presumption favoring arbitration may put a thumb on the interpretive scale when a contract is ambiguous, "a compelling case for nonarbitrability should not be trumped by a flicker of interpretive doubt." *Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 55 (3d Cir. 2001) (citation and internals omitted).

## A. The parties' arbitration agreement is broad, and so the presumption in favor of arbitrability applies.

Here, the parties' arbitration agreement is "broad rather than narrow." *DCK N. Am., LLC v. Burns & Roe Servs. Corp.*, 218 F. Supp. 3d 465, 475 (W.D. Pa. 2016). "Broad arbitration provisions … are those which apply to 'any dispute' arising out of an agreement." *Id.* (citation omitted). In contrast, "[n]arrow arbitration provisions are those that, for example, expressly limit the range of arbitrable disputes to a single category or function, such as limiting the arbitrator's power to modifying a penalty where only disciplinary layoffs or

discharges which violate the terms of an agreement are involved." *Id.* (citation and internals omitted).

Under Article 7 of the CBA, the parties agreed, subject only to the precondition of informal dispute resolution, that SEIU may compel arbitration of "any dispute or complaint" arising between the parties. [ECF 1-2 at Art. 7.1; Art. 7.2; Art. 7.5]. This is a broad arbitration provision. *See, e.g., AT & T Techs., Inc. v. Commc'ns Workers of Am.,* 475 U.S. 643, 650 (1986) ("Such a presumption is particularly applicable where the clause is as broad as the one employed in this case, which provides for arbitration of 'any differences arising with respect to the interpretation of this contract or the performance of any obligation hereunder....'.").

Thus, the Court begins with the presumption that any dispute arising under the CBA is subject to Article 7's broad arbitration clause, and will hold otherwise only if "it may be said with positive assurance that the contract's arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Cup*, 903 F.3d at 64 (internals omitted).

### B. Article 10.5(a) does not exclude SEIU's grievance from the parties' broad arbitration agreement.

To justify its refusal to arbitrate SEIU's grievance, Heritage Valley makes only one argument—that Article 10.5(a) of the CBA excludes the matters raised in SEIU's grievance from arbitration. The first sentence of Article 10.5(a) states that Heritage Valley "shall not provide regular ongoing staffing in any area through the use of … pulling of employees." [ECF 1-2 at Art. 10.5]. The next sentence then provides that, "[i]n the event that such potential problem areas are identified, they shall be referred to the Professional Practice Committee for a recommended solution, and any dispute shall not be subject to the grievance and arbitration procedure in Article 7."

[*Id.*].  It's the meaning of the last clause, beginning with "and any dispute shall not," that is the focus of the parties' disagreement.

Heritage Valley argues that a "dispute about 'pulling' bargaining unit [nurses] to work in non-bargaining unit positions is exactly the type of matter which falls within the arbitration exclusion language of Article 10.5(a)[.]" [ECF 26 at p. 2].  More specifically, it argues that SEIU "alleges that [Heritage Valley] has done exactly what Article 10.5 refers to, which is that [Heritage Valley] has regularly been pulling [nurses]…to other units[.]"  [*Id.* at p. 3] (internals omitted).

The Court disagrees with this interpretation of Article 10.5(a), and its application to SEIU's grievance, for two reasons.  First, the plain language of the arbitration exclusion makes clear that it refers only to disputes about the "recommended solution" proposed by the Professional Practice Committee, and not disputes about whether Heritage Valley has breached Article 10.5(a) in the first place.  Second, even if the CBA excludes all alleged violations of Article 10.5(a) from arbitration (and it does not), SEIU's other claims would still be arbitrable.  The Court will address each of these points in turn.

   1.   **The plain language of Article 10.5(a) only excludes disputes about the "recommended solution" from arbitration.**

"The paramount goal of contract interpretation is to determine the intent of the parties." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 587 (3d Cir. 2009) (citation and internals omitted).  "Pennsylvania contract law begins with the firmly settled principle that the intent of the parties to a written contract is contained in the writing itself." *Id.* (internals omitted).  Thus, "[t]he plain meaning of the words used in the contract controls, not the silent intentions of the contracting parties." *Chambers v. Chesapeake Appalachia,*

*L.L.C.*, 359 F. Supp. 3d 268, 275 (M.D. Pa. 2019) (citation and internals omitted).  And when the language of a written contract is clear, a court need look no further than the writing itself to determine the intent of the parties.  *See Brokers Title Co. v. St. Paul Fire & Marine Ins. Co.*, 610 F.2d 1174, 1178 (3d Cir. 1979) (citation omitted); *In re Breyer's Estate*, 379 A.2d 1305, 1309 (Pa. 1977) (citation omitted); *DL Res., Inc. v. FirstEnergy Sols. Corp.*, 506 F.3d 209, 217 (3d Cir. 2007) (citation omitted).

### a. Heritage Valley's interpretation is inconsistent with ordinary English.

Here, the Court must decide what the term "any dispute" refers to in the phrase: "… and any dispute shall not be subject to the grievance and arbitration procedure in Article 7."  [ECF 1-2 at Art. 10.5(a)].  Heritage Valley contends that this arbitration exclusion applies broadly, to "any dispute" related to an alleged violation of Article 10.5(a).  But that interpretation does not track the plain language of the contract.

Recall again the text of Article 10.5(a).  The first sentence forbids Heritage Valley from "pulling" union nurses away from their assigned units to provide "regular ongoing staffing" in any area of the hospital:

> Heritage Valley, Beaver shall not provide regular ongoing staffing in any area through the use of Agency personnel, temporary or contract nurses or floating/pulling of employees.

The second sentence provides that whenever the parties identify "potential problem areas," *i.e.*, areas of the hospital with staffing shortages, they should go to the Professional Practice Committee for a recommended solution, but that if there is a dispute over that solution, it cannot go to arbitration:

> In the event that such potential problem areas are identified, they shall be referred to the Professional Practice Committee for a

recommended solution, and any dispute shall not be subject to the grievance and arbitration procedure in Article 7.

Based on this plain language of Article 10.5(a), only disputes about a "recommended solution" proposed by the Professional Practice Committee are exempt from arbitration, while disputes about whether Heritage Valley has violated Article 10.5(a) in the first place, such as this one, remain arbitrable. This interpretation reflects how an ordinary English speaker would understand these sentences. When construing a contract, "the rules of English grammar apply." *In re NXXI Inc.,* 216 F. Supp. 3d 381, 393 n. 11 (S.D.N.Y. 2016). Likewise, "punctuation may be used as an aid in interpreting a contract." *Plymouth Mut. Life Ins. Co. v. Illinois Mid-Continent Life Ins. Co.*, 378 F.2d 389, 391 (3d Cir. 1967) (citation omitted); *see also Sullivan v. Abraham*, 488 S.W.3d 294, 297 (Tex. 2016) ("Punctuation is a permissible indicator of meaning."); A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts*, p. 161 (2012) ("Punctuation in a legal text … will often determine whether a modifying phrase or clause applies to all that preceded it or only to a part.").

Both punctuation (a period) and the first clause of the second sentence separate Article 10.5(a)'s arbitration exclusion from its prohibition on using "pulling of employees" to provide "regular ongoing staffing." *See* [ECF 1-2 at Art. 10.5(a)]. This syntax and punctuation insulate the phrase "any dispute" from the prohibition on excessive "pulling of employees" in the previous sentence. *See* Scalia & Garner, *Reading Law*, at p. 162 ("Periods and semicolons insulate words from grammatical implications that would otherwise be created by the words that precede or follow them[.]"); Restatement (Second) of Contracts § 202, cmt. d ("Meaning is inevitably

dependent on context. A word changes meaning when it becomes part of a sentence, the sentence when it becomes part of a paragraph.").

In this grammatical context, then, the phrase "any dispute" is naturally read to refer to disputes about the immediately preceding "recommended solution," not all disputes about violations of Article 10.5(a) more broadly. *See, e.g.*, *Fakhouri v. Ober Gatlinburg, Inc.*, 821 F.3d 719, 722 (6th Cir. 2016) ("Because 'associated with' immediately follows 'tramways,' that is the word it modifies."); *Barclays Bank PLC v. Poynter*, 710 F.3d 16, 21 (1st Cir. 2013) ("Each of these subsections contains an independent, complete thought and each ends with a period for punctuation."); *United States v. 12,918.28 Acres of Land in Webster Par., La.*, 61 F. Supp. 545, 552 (W.D. La. 1945) ("The period as a punctuation mark severs as distinctly as if there were two paragraphs.").

In contrast, what Heritage Valley suggests is that the Court derive the meaning of "any dispute" by leapfrogging the entire preceding clause of the sentence that phrase appears in to refer to the contents of the previous, wholly separate sentence. This is an unnatural reading of the contractual text.

In short, the plain meaning of Article 10.5(a) makes clear that the arbitration exclusion only applies to disputes over a recommended solution by the Professional Practice Committee. And because the plain language of Article 10.5(a) is "clear" in all respects relevant to arbitrability, the Court need look no further than the writing itself to determine that SEIU's grievance is arbitrable. *See Brokers Title*, 610 F.2d at 1178; *In re Breyer's Estate*, 379 A.2d at 1309; *DL Res.*, 506 F.3d at 217; *see also First Liberty Ins. Corp. v. McGeehan*, 381 F. Supp. 3d 478, 485 (W.D. Pa. 2019) (holding that a court should not "find a particular provision ambiguous simply because the parties disagree on the proper construction.") (citation and internals omitted). At a minimum, the CBA's arbitration clause is "susceptible of an interpretation that covers the

asserted dispute," including the alleged violation of Article 10.5(a). *Cup*, 903 F.3d at 64. SEIU is entitled to summary judgment on this basis alone.

### b. Heritage Valley's logic-based argument cannot overcome the plain meaning of Article 10.5(a).

Heritage Valley does not offer any compelling, contrary reading of Article 10.5's text. Instead, it offers a logic-based interpretation that is not compelling and cannot overcome Article 10.5's plain meaning. Specifically, Heritage Valley points back to Article 10.1 of the CBA, which provides that "concerns regarding staffing may be raised with the Professional Practice Committee" and that Heritage Valley retains authority to "make final decisions and set staffing levels." [ECF 17 at p. 6; ECF 1-2 at Art. 10.1]. From this, Heritage Valley says it "logically follows" that the parties intended Article 10.5(a)'s arbitration exclusion to direct all violations of that provision "to the same Professional Practice Committee for a recommended solution." [*Id.*].

But does it? Indeed, the "logic" of Article 10 compels a different result. To begin with, Article 10.1 does not, by its own terms, reflect an intent to exclude any category of disputes from arbitration and "direct" them to the Professional Practice Committee instead. Rather, it says only that concerns about staffing "may" be raised with the Committee, presumably if the parties wish to do so. [ECF 1-2 at Art. 10.1]. Article 10.5(a) is the only other provision of Article 10 that even mentions the Professional Practice Committee, let alone purports to require the parties to submit anything to it. The remaining provisions of Article 10 establish various mandatory standards, violations of which are almost certainly arbitrable given the CBA's broad arbitration clause. *See, e.g.*, [*Id.* at Art. 10.4 ("[S]uch flexing down shall be done as follows, provided the remaining employees are qualified … to perform the work[.]")]; [*Id.* at Art. 10.1 ("…[Heritage Valley] shall maintain a volunteer list by

department. … Employees on the volunteer list will be offered the assignment in rotating order beginning with the most senior employee…")].

The "logic" of Article 10.5 itself also undermines Heritage Valley's interpretation. In the first sentence of Article 10.5(a), the parties made clear, in mandatory terms, that Heritage Valley "shall not" pull union nurses to cover problem areas on a "regular ongoing" basis. Then, in the second sentence, the parties also agreed to submit any "potential problem areas" to the Professional Practice Committee for a "recommended solution." Implicit in the second sentence is that the "solution" proposed by the Committee cannot be a proposal to address staffing shortages in a particular problem area by "pulling" nurses from other units to cover the area on a "regular ongoing" basis—that is the very thing the first sentence of Article 10.5(a) forbids. As a result, there should never be a "dispute" over a recommended solution that would involve "pulling" union nurses to provide "regular ongoing" staffing.

Yet even assuming the Professional Practice Committee were to disregard the mandatory language in Article 10.5(a) and recommend a solution to a "problem area" that involved regular "pulling" of unionized nurses, Heritage Valley's argument stops short. That is, Heritage Valley is right that it "logically follows" that any recommendation by the Committee would ultimately have to go to Heritage Valley for a "final decision" under Article 10.1, and that Heritage Valley retains the right to make "final decisions" with respect to staffing on its own. But it does not follow that Article 10.5(a) also excludes disputes over any "final decision" made by Heritage Valley from arbitration, including disputes about whether that decision violates the first sentence of Article 10.5(a).

In other words, if Heritage Valley makes a "final decision" to address a "problem area" by doing what Article 10.5(a) forbids, *i.e.*, "pulling" nurses to

provide "regular ongoing staffing" in that "area," SEIU may enforce compliance with Article 10.5(a) through arbitration. A "final decision" by Heritage Valley though is different than a "recommended solution" by a committee. A "recommended solution" is simply an advisory opinion made by the "consensus" of a committee as a first step in resolving a problem with staffing shortages in specific areas of the hospital. As such, it would be sensible for the parties to exclude disputes over such an advisory recommendation from arbitration.

The same cannot be said about Heritage Valley's "final decision," which, as its name suggest, is "final" and would therefore be riper for dispute resolution and thus less likely to be excluded from arbitration. *C.f. Palazzolo v. Sonne,* 221 F. App'x 516, 517 (9th Cir. 2007) ("The Memorandum of Understanding governing Palazzolo's employment contemplates that a departmental decision is just the first rung on the ladder leading to a final decision. Next come proceedings before an arbitrator. Then, the Board of Supervisors makes the final decision."); *Youngblood v. Potter*, 262 F. Supp. 2d 1309, 1315 (M.D. Ala. 2003) ("Absent the filing of an appeal of the Step 1 decision, the Postal Service's decision at Step 1 and the Union's actions in assisting with the Plaintiff's grievance became final actions[.]"); *Smith v. Standard Oil Co.*, 805 F.2d 1036, 1036 (6th Cir. 1986) ("[A] final decision occurred once five days from plaintiff's termination passed without the Union having filed a grievance.").

Given all this, the Court finds that Heritage Valley's logic-based argument cannot overcome the otherwise unambiguous, plain language of the CBA. What this means in practice is that: (1) SEIU cannot compel Heritage Valley to arbitrate disputes about whether the Professional Practice Committee should recommend, or whether Heritage Valley should adopt, any particular "recommended solution"; and (2) disputes about Heritage Valley's

"final decision" with respect to any issue, including disputes about whether its decision violates Article 10.5(a) or another provision of the CBA, remain arbitrable.

### 2. Even if SEIU's claim for breach of Article 10.5(a) is not arbitrable, its other claims are.

Even putting the Court's interpretation of Article 10.5(a) aside, SEIU is entitled to summary judgment for another reason—the alleged violation of Article 10.5(a) is only one of SEIU's several claims, all of which are arbitrable. In fact, SEIU has offered to not pursue the alleged violation of Article 10.5(a) in arbitration, if dropping that claim will "render resolution of the question of arbitrability completely straightforward." [ECF 24 at 4 n. 3]. While the Court finds this concession unnecessary based on its analysis above, it agrees that Heritage Valley's argument would, at most, only impact the arbitrability of SEIU's claim for a breach of Article 10.5(a).

The main thrust of SEIU's grievance is that Heritage Valley forced unionized nurses to work as "patient care assistants" and to care for patients above mandatory nurse-to-patient ratios, allegedly in violation of Article 5, Article 21, and Appendix A of the CBA. [ECF 1-4]. SEIU also alleges that Heritage Valley violated these provisions "regularly" and while "pulling" those nurses to different units—a possible additional violation of Article 10.5(a). But the presence of that claim does not impact the arbitrability of the others, each of which would ordinarily be arbitrable under the parties' agreement. Thus, even assuming the CBA excludes all alleged violations of Article 10.5(a) from arbitration (and it does not), that wouldn't meaningfully change the outcome of this case. Instead, all SEIU's other claims would still go to arbitration.

Heritage Valley's contrary argument seems to be that so long as there is some nexus between an alleged violation of Article 10.5(a) and an alleged

violation of the CBA's other provisions (*e.g.*, staff-to-patient ratios), Article 10.5(a) excludes the entire grievance from arbitration. *See, e.g.*, [ECF 26 at p. 3 ("HVHS therefore submits that the dispute before the Court does indeed ***involve*** the allegation that HVHS was violating Article 10.5 of the CBA by providing 'regular ongoing staffing' through 'regularly … pulling RNs' to other units to perform non-nursing duties. … HVHS and the Union intended in Article 10.5(a) to expressly exclude ***this kind of*** dispute from arbitration.") (emphasis added) (internals omitted)].  In other words, if Heritage Valley violates Article 5, Article 21, and Appendix A as part of conduct that *also* violates Article 10.5(a), its position would be that the arbitration exclusion applies to the whole dispute and the only relief is referral to the Professional Practice Committee.  For at least three reasons, this cannot be correct.

First, this interpretation has no basis in the text of the contract.  Article 10.5(a) contains no exclusion of disputes about violations of staffing ratios, job class restrictions, or any other arbitrable CBA protections when they occur in connection with a violation of Article 10.5(a).  The Court is required infer the "mutual intention of the parties … from the written provisions of the contract." *Miller v. Poole*, 45 A.3d 1143, 1146 (Pa. Super. Ct. 2012).  And if the parties had wanted to exclude otherwise arbitrable CBA violations from their broad arbitration agreement when those violations shared some nexus with a violation of Article 10.5(a), they could have easily said so.  *C.f. CNH Indus. N.V. v. Reese*, 138 S. Ct. 761, 766 (2018) ("If the parties meant to vest health care benefits for life, they easily could have said so in the text.  But they did not.").  That they did not do so clearly is particularly significant here, because the presumption of arbitrability "may be rebutted only by the most forceful evidence of a purpose to exclude the claim from arbitration." *Rite Aid*, 595 F.3d at 131 (internals omitted).

Second, interpreting Article 10.5(a) to exclude from arbitration all ancillary CBA violations, rather than just the violation of Article 10.5(a) itself, would lead to absurd results. *See Fagal v. Marywood University*, 786 F. App'x 353, 359 (3d Cir. 2019) ("[W]e eschew constructions of contracts that produce absurd results.") (internals omitted). More specifically, adopting this view would make Heritage Valley's compliance with the entire CBA effectively voluntary. For example, it would allow Heritage Valley to require unionized nurses to care for patients in excess of staff-to-patient ratios, accept lower compensation, or work longer hours than the CBA otherwise allows. So long as it did those things while *also* violating Article 10.5(a)—*i.e.*, while "pulling" the affected nurses to work at new stations on a "regular ongoing" basis— Heritage Valley could refuse to address the grievances that result, and SEIU would have no meaningful recourse. Indeed, SEIU could neither arbitrate nor litigate because, in Heritage Valley's view, the sole remedy for a dispute which "involves" pulling nurses to provide regular, ongoing staffing is to refer the matter for a recommended solution, which Heritage Valley is free to ignore.

Such a scheme would also encourage Heritage Valley to do the opposite of what Article 10.5 states that both parties "agree" is "in the interest of patient care"—ensuring that "all staff assigned to a particular unit or work area shall be properly trained, oriented, and familiar with the policies and procedures of that unit or work area." [ECF 1-2 at Art. 10.5]. Indeed, under its view, Heritage Valley would have compelling reasons to disregard that shared goal and violate Article 10.5(a) as flagrantly as possible. By doing so, Heritage Valley would free itself to cut nurse salaries to market rates, impose impermissible job duties or requirements as it saw fit, and discipline or terminate unionized nurses like at-will employees, so long as it did those things while "pulling" the affected nurses to new units. This reduces the CBA to a

minor speed bump for Heritage Valley to overcome (by reassigning nurses) before doing whatever it wants.

Of course, in most cases, parties to a contract can agree to almost anything they want. *See Bowen v. Hyundai Motor Am.*, Civ. No. 15-6942, 2016 WL 3466085, at *3 (D.N.J. June 22, 2016) ("Absent such uniquely important public policy concerns, courts should uphold the right of the freedom to contract."); *Greene v. Oliver Realty, Inc.*, 526 A.2d 1192, 1197 (Pa. Super. Ct. 1987) ("The right of competent adults to contract is the lifeblood of our free enterprise system. Voluntary agreements are the foundation of our society's freedom and prosperity."). Whatever that agreement may be, "[i]t is not the function of the courts to rewrite a contract … or substitute their judgment for that of the parties … in order to relieve one of the parties from the apparent hardship of an improvident bargain." *Marriott Corp. v. Dasta Const. Co.*, 26 F.3d 1057, 1068 (11th Cir. 1994) (citation and internals omitted).

But there is nothing in this contract specifically, or the nature of collective bargaining generally, to indicate that SEIU and Heritage Valley intended to condition enforceability of their CBA's fundamental protections on whether violations occurred while Heritage Valley shuffled nurses about the hospital. Indeed, it defies common sense to suggest that a sophisticated labor union like SEIU would have accepted substantial restrictions on its own conduct, such as Article 6's "No-Strike" provisions, in exchange for that. Of course, if the parties had, in fact, agreed to such terms, the Court would enforce them. But the implausibility of such an arrangement bolsters the Court's conclusion that they did not. *See, e.g.*, *McElroy v. B.F. Goodrich Co.,* 73 F.3d 722, 726 (7th Cir. 1996) ("We read the contract as a whole and ask does it 'make sense' to imagine Goodrich having granted McElroy the potential huge windfall that he seeks[.]").

Third, Heritage Valley's interpretation of the CBA is also inconsistent with how courts typically address arbitrability when multiple, related claims are at issue. That is, they usually divvy up the claims and compel arbitration of any that are arbitrable, even if some are not. *See, e.g.*, *KPMG LLP v. Cocchi,* 565 U.S. 18, 22 (2011) ("[W]hen a complaint contains both arbitrable and nonarbitrable claims, the Act requires courts to compel arbitration of pendent arbitrable claims when one of the parties files a motion to compel, even where the result would be the possibly inefficient maintenance of separate proceedings in different forums."); *Anderson v. Salesforce.com, Inc.*, 2018 WL 6728015, at *2 (N.D. Cal. Dec. 21, 2018) ("[T]hough it is undisputed that plaintiff's SOX claim is not subject to arbitration, that has no bearing on whether plaintiff's ten arbitrable claims must proceed in arbitration."); *In re Friedman's, Inc.*, 372 B.R. 530, 542 (Bankr. S.D. Ga. 2007) ("[T]he arbitrable claims are to be sent to arbitration[.]").

Without a clear, contractual command to the contrary, the Court sees no reason to deviate from this typical practice here. Thus, even assuming the CBA excludes all violations of Article 10.5(a) from arbitration (and it does not), that would not bar SEIU from compelling arbitration of all remaining claims.

## CONCLUSION

For all the reasons discussed above, the Court holds that the plain terms of the parties' CBA establish that SEIU's grievance is arbitrable. The Court will therefore grant SEIU's motion for summary judgment. The Court will also deny Heritage Valley's cross-motion for summary judgment, having found that SEIU is entitled to relief under the undisputed facts agreed to by both parties.

Finally, to avoid any doubt, the Court clarifies that, because it finds that the pending grievance is arbitrable in its entirety, SEIU is free to pursue the

alleged violation of Article 10.5(a) in arbitration alongside its other claims, if it so chooses, notwithstanding its offer to forgo that claim. [ECF 24 at 4 n. 3].

A corresponding order follows.

DATED: March 4, 2020

BY THE COURT:

*/s/ J. Nicholas Ranjan*
United States District Judge